# ORIGINAL



FILED IN CLERK'S OFFICE
U S D C Atlanta

APR 1 7 2003

LUTHER D. THOMAS, Clerk
By W Ross Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| JAMES BROWN, on behalf of himself and all others similarly situated, | Civil Action No. |
| Plaintiff, | **1:03-CV-1027** |
| vs. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT** |
| MIRANT CORPORATION, THE SOUTHERN COMPANY, VANCE BOOKER, S. MARCE FULLER, RAYMOND D. HILL, JAMES A. WARD, A.W. DAHLBERG, A.D. CORRELL, ELMER B. HARRIS, WILLIAM J. HIERPE, DAVID J. LESAR, W.L. WESTBROOK, and UNKNOWN FIDUCIARY DEFENDANTS 1-100, | |
| Defendants. | |

Plaintiff James Brown, a participant in the Mirant Services Employee Savings Plan (the "Employee Plan"), on behalf of himself and a class of all others similarly situated as participants in the Employee Plan, a related plan, the Mirant Services Bargaining Unit Employee Savings Plan (the "Bargaining Unit Plan"), and their predecessor plans, including the Southern Energy Resources Employee Savings Plan, Southern Energy Resources Bargaining Unit Employee Savings Plan, Southern Energy Resources, Inc. Savings Plan for Covered Employees, Southern Energy Resources, Inc. Bargaining Unit Savings Plan, and Southern

1

FORMS RECEIVED
Consent To US Mag. ✓
Pretrial Instructions ✓
Title VII NIC
[signature]

Energy, Inc. Bargaining Unit Savings Plan (collectively, the "Predecessor Plans") (collectively, the Employee Plan, Bargaining Unit Plan, and Predecessor Plans will be referred to herein as the "Plans"), alleges as follows:

## **INTRODUCTION**

1.     This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, on behalf of the participants in and beneficiaries of the Plans, which are 401(k) plans established and sponsored by defendant Mirant Corporation ("Mirant" or the "Company") as a benefit for its employees.

2.     401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan may have the option of purchasing the common stock of his/her employer, often the sponsor of the plan, as part of his/her retirement investment portfolio.  Investments in Mirant common stock is one of the investment alternatives in each of the Plans.

3.     Plaintiff Brown is a retired employee of Mirant and a participant in the Employee  Plan.  Plaintiff's retirement investment portfolio includes Mirant stock.  Plaintiff alleges that defendants, as fiduciaries of the Plans, breached their

duties to him and the other participants and beneficiaries of the Plans in violation

of ERISA § 409, 29 U.S.C. § 1109, particularly with regard to the Plans' holdings

of Mirant stock.

4.     Defendants are liable under ERISA to restore losses sustained by the

Plans and their participants as a result of defendants' breaches of their fiduciary

obligations.  Because his claims apply to the Plans' participants and beneficiaries

as a whole, and because ERISA authorizes a participant such as plaintiff to sue for

plan-wide relief for breaches of fiduciary duty, plaintiff brings this action on

behalf of himself and all the participants and beneficiaries of the Plans during the

Class Period, as defined herein.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

6.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29

U.S.C. § 1132(e)(2), because the Plans were administered in this district, some or

all of the fiduciary breaches for which relief is sought occurred in this district,

and/or some defendants reside or maintain their primary place of business in this

district.

3

## THE PLANS

7.     The Employee Plan is an "employee pension benefit plan," as defined
by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  Further, the Employee Plan is an
"eligible individual account plan" within the meaning of section § 407(d)(3) of
ERISA, 29 U.S.C. § 1107(d)(3), and is a "qualified cash or deferred arrangement"
within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).  The relief requested in
this action is for the benefit of the Employee Plan and its
participants/beneficiaries.

8.     The Bargaining Unit Plan is an "employee pension benefit plan," as
defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The relief requested in
this action is for the benefit of the Bargaining Unit Plan and its
participants/beneficiaries.

9.     The Employee Plan and Bargaining Unit Plan are sponsored by
Mirant.  The Predecessor Plans were sponsored by Southern Energy, Inc. and
Southern Energy Resources, Inc., then-subsidiaries of The Southern Company
("Southern Company").

10.     Participants in the Employee Plan are permitted to contribute from
1% to 19% of their eligible pre-tax earnings.  Included among the Employee
Plan's available investment alternatives is a fund consisting of Mirant common

4

stock.

11.    For Employee Plan participants, Mirant matches 75% of participant contributions up to 6% of their eligible compensation. All matching contributions are invested in the Mirant Corporation Stock Fund, though participants may redirect these contributions to any of the investment funds offered by the Plan.

12.    Upon information and belief, defendants include named and de facto fiduciaries with respect to the Plans. All defendants exercised discretionary authority or control regarding management of the Plans; management of the Plans' assets; and/or administration of the Plans.

## PARTIES

### Plaintiff

13.    Plaintiff Brown is a retired employee of Mirant and a participant in the Employee Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and continues to hold Mirant shares in his retirement investment portfolio.

### Defendants

14.    Defendant Mirant is a Delaware corporation with its principal executive offices located at 1155 Perimeter Center West, Suite 100, Atlanta, Georgia 30338. According to its public filings, Mirant is a global competitive

energy company that produces and markets electric power and natural gas. Prior to October 2, 2000, Mirant was known as Southern Energy, Inc. and was a wholly-owned subsidiary of Defendant Southern Company. On October 2, 2000, Southern Company completed an initial public offering of 66.7 million shares of Mirant common stock, which represented approximately 20% of the outstanding equity of Mirant. On February 19, 2001, Southern Company spun off the remaining equity in Mirant to Southern Company shareholders.

15.    According to the Plans' 11-K submissions to the Securities and Exchange Commission ("SEC") for fiscal 2001, "[t]he Company serves as Plan administrator" for the Employee Plan and Bargaining Unit Plan.

16.    Defendant Southern Company is a Delaware corporation with its principal executive offices located at 270 Peachtree Street, N.W., Atlanta, Georgia 30303. According to its public filings, Southern Company is a holding company that owns, among other things, electric power utilities in the southeastern United States.

17.    Defendant Vance Booker ("Booker") served as Mirant's Senior Vice President, Administration and Technical, during the Class Period. Booker signed the Plans' 11-K submissions for 2000 and 2001. Upon information and belief, Booker was a fiduciary of the Plans within the meaning of ERISA in that he

6

exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

18.    Defendant S. Marce Fuller ("Fuller") served as Mirant's President and Chief Executive Officer ("CEO") during the Class Period.   Upon information and belief, Fuller was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

19.    Defendant Raymond D. Hill ("Hill") served as Mirant's Executive Vice President and Chief Financial Officer ("CFO") during the Class Period. Upon information and belief, Hill was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

20.    Defendant James A. Ward ("Ward") served as Mirant's Senior Vice President, Finance and Accounting, during the Class Period.   Upon information and belief, Ward was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans'

assets.

21.    Defendant A.W. Dahlberg ("Dahlberg") served as Chairman of the Board of Mirant and Chairman of the Board and CEO of Southern Company during the Class Period.  Upon information and belief, Dahlberg was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

22.    Defendant A.D. Correll ("Correll"), a Director of the Company during the Class Period, signed Mirant's S-8 SEC submission dated March 5, 2001 that registered shares of Mirant common stock for the Plans. Upon information and belief, Correll was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

23.    Defendant Elmer B. Harris ("Harris"), a Director of the Company during the Class Period, signed Mirant's S-8 SEC submission dated March 5, 2001 that registered shares of Mirant common stock for the Plans. Upon information and belief, Harris was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans'

8

assets.

24.     Defendant William J. Hjerpe ("Hjerpe"), a Director of the Company during the Class Period, signed Mirant's S-8 SEC submission dated March 5, 2001 that registered shares of Mirant common stock for the Plans. Upon information and belief, Hjerpe was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

25.     Defendant David J. Lesar ("Lesar"), a Director of the Company during the Class Period, signed Mirant's S-8 SEC submission dated March 5, 2001 that registered shares of Mirant common stock for the Plans. Upon information and belief, Lesar was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

26.     Defendant W.L. Westbrook ("Westbrook"), a Director of the Company during the Class Period, signed Mirant's S-8 SEC submission dated March 5, 2001 that registered shares of Mirant common stock for the Plans. Upon information and belief, Westbrook was a fiduciary of the Plans within the meaning

of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

27.     Unknown Fiduciary Defendants 1-100 are residents of the United States and are or were fiduciaries of the Plans during the Class Period, including any member of an administrative committee and/or an oversight committee of the Mirant Board of Directors or Southern Company Board of Directors.  These defendants include members of Mirant's and Southern Company's: (I) Finance Committee, (ii) Investment Review Committee, and (iii) Corporate Benefits Department.  Their identities are currently unknown to plaintiff; once their identities are ascertained, plaintiff will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of any of the Plans at any time between January 1, 2000 and the present (the "Class Period"), and whose accounts included investments in Mirant stock or the Mirant Corporation Stock Fund.

Excluded from the Class are the defendants, any entity in which the defendants have a controlling interest, or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of the defendants.

29.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time, and can only be ascertained through appropriate discovery, plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plans during the Class Period.

30.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether defendants each owed a fiduciary duty to plaintiff and members of the Class;

(b)     whether defendants breached their fiduciary duties to plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

(c)     whether defendants violated ERISA; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

11

31.    Plaintiff's claims are typical of the claims of the members of the Class because plaintiff and the other members of the Class each sustained damages arising out of the defendants' wrongful conduct in violation of federal law as complained of herein.

32.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

33.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

34.    Class action status is also warranted under the other subsections of Rule 23(b) because: (I) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory,

or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

35.    There are one or more putative securities class actions pending against Mirant and other defendants. The claims herein arise under ERISA and related principles, and are not being asserted by the plaintiffs in the securities class actions. The named plaintiffs in those class actions do not adequately represent the plaintiff or the Class herein with respect to ERISA claims and may be subject to defenses and limitations of liability under the Private Securities Litigation Reform Act, 15 U.S.C. § 74 u-4 *et seq.*, and other statutes or Rules that do not apply to the claims asserted herein.

36.    As required by ERISA, defendants carry insurance for claims asserted herein that may not be available to the defendants in the securities class actions.

37.    There are people in this Class who are not members of the classes or putative classes in the securities class action cases.

## DEFENDANTS' FIDUCIARY STATUS

38.    During the Class Period, upon information and belief, defendants had discretionary authority with respect to the management of the Plans and/or the

13

management or disposition of the Plans' assets, and had discretionary authority or responsibility for the administration of the Plans.

39.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1).

40.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. Section 3(21)(A)(I) of ERISA, 29 U.S.C. §1002(21)(A)(I), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

41.    Upon information and belief, instead of delegating all fiduciary responsibility for the Plans to external service providers, Mirant chose to comply with the requirement of § 402(a)(1) by internalizing this fiduciary function, including by appointing its own directors, officers and employees to manage and administer the Plans.

42.     The Plans are sponsored and administered solely by Mirant through
employee-fiduciaries.  Upon information and belief, defendant Booker was an
employee of the Company, and was responsible for, *inter alia*, establishing
investment objectives and policies for the Plans, including investments in Mirant
stock.  Defendant Booker exercised authority and/or control with respect to
management or disposition of Plan assets within the meaning of section
3(21)(A)(I) of ERISA, 29 U.S.C. §1002(21)(A)(I).  The actions of such employee-
fiduciaries were on behalf of and are attributable to the Company.

43.     In addition, under ERISA, in various circumstances, non-fiduciaries
who knowingly participate in fiduciary breaches may themselves be liable.  To the
extent any of the defendants are held not to be fiduciaries, they remain liable as
non-fiduciaries who knowingly participated in the breaches of fiduciary duty
described below.

44.     During the Class Period, Mirant's direct and indirect communications
with Plan participants included material misrepresentations and omissions
regarding Plan-related investments in Company stock.  These communications
included, but were not limited to, SEC filings, annual reports, press releases and
conference calls with investment analysts. Mirant also acted as a fiduciary to the
extent of this activity.

15

## SUBSTANTIVE ALLEGATIONS

### Mirant Stock as an Imprudent Plan Investment

45.    During the Class Period, through various direct and indirect modes of

communication, defendants misled Plan participants by concealing Mirant's

participation in the illegal manipulation of energy prices in California during 2000

and 2001 as well as other irregular and unlawful accounting manipulations tied to

energy trading.

46.    On October 23, 2000, Mirant, then known as Southern Energy, Inc.

issued a press release which stated, in relevant part,:

> Southern Energy Inc. (NYSE: SOE) announced a 59 percent increase in
> third quarter earnings from operations, reflecting strong performance from
> its North American business, President and Chief Executive Officer Marce
> Fuller announced today in the company's first earnings report since its
> record-setting initial public offering.
>
> . . .
>
> "We had a terrific quarter in North America, due primarily to strong
> performance from our integrated assets and trading in the West and in New
> York," Fuller said. "We also benefited from the operation of 600 megawatts
> of new capacity near major load centers in Dallas and Chicago."
>
> These results were reduced by reserves taken to fully reflect an unfavorable
> initial decision by an administrative law judge in a regulatory proceeding in
> California, where Southern Energy owns 3,065 megawatts in the San
> Francisco area.

47.    On December 16, 2000, Mirant raised its earnings estimate for fiscal

16

2000 by almost 10%, and increased its 2001 forecast by almost the same figure.

Mirant attributed its improved earnings outlook to "outstanding business

performance, especially in the North American natural gas market."

48.     On January 19, 2001, Mirant issued a press release which stated:

Southern Energy Inc. (NYSE: SOE) now operating as Mirant Corporation, today announced strong financial and operational results, reporting net income from continuing operations for 2000 of $332 million and $60 million for fourth quarter 2000.

> Mirant's Americas group earned 11 cents per share from operations in fourth quarter 2000, compared with 7 cents per share in the fourth quarter of 1999. Results reflect the improved performance of the company's marketing and risk management operations, especially in its natural gas business. Earnings also reflect credit reserves taken with respect to the power crisis in California.

49.     On March 2, 2001, Mirant issued a press release which stated:

Mirant Corp. (NYSE: MIR) reiterated today that it seeks timely payment for all electricity it has sold and continues to sell into the California market, and that payment of amounts owed to generators is critical to ending California's energy crisis.

"We look to receive payment for all the electricity we've sold and continue to sell, and we want quick payment for the past due amounts. We consider additional delays unacceptable. Any talk of additional delay or of partial payment is counterproductive to finding a solution," said Randy Harrison, chief executive officer of Mirant's western U.S. operations.

Harrison's comments came amid reports that resolution of the credit problems of the California utilities might not happen until August and that generators will be asked to agree to partial payments.

Harrison also noted that the basic solution to California's problem - the construction of new power plants - will be far less likely to occur in a business climate where contractual buying and selling agreements are not honored.

"We entered the market well after the market rules were in place, and we played by the rules throughout," Harrison said. "We didn't ask that transactions be invalidated or modified when we were losing money, and we will do everything in our power to obtain payment on the profitable transactions we made."

50.    On March 14, 2001, Mirant issued a press release which stated:

Mirant Corp. (NYSE: MIR) announced today it is increasing its first quarter earnings per share guidance to a range of 46 to 48 cents per share, up from 16 to 18 cents per share as previously projected. Mirant also raised its full year guidance to a range of $1.55 to $1.60 per share, up from $1.15 to $1.20 per share as previously projected.

"This significant increase in our earnings estimates is due to strong growth from our integrated North American business unit, which combines power and natural gas assets with risk management and energy marketing," said Marce Fuller, president and chief executive officer of Mirant. "This growth reflects a significant increase in gas marketing volumes and profitability and the continued strong performance of our power business in the western United States."

The company's first quarter expectations also reflect anticipated significant, additional reserves taken in relation to market conditions in the West region.

Mirant's earnings projections for the remainder of the year range from approximately 30 to 35 cents per share for second quarter, 40 to 45 cents per share for third quarter and 30 to 35 cents per share for fourth quarter.

51.    On March 23, 2001, Mirant issued a press release which stated:

Mirant Corp. (NYSE: MIR), owner of three power plants in California,

today restated that it has provided all available electricity from its power plants during the ongoing energy crisis at fair and reasonable market prices.

"Prices for electricity coming from these plants have always been fair and reasonable, particularly when you consider the cost of fuel, the severe imbalance of supply and demand in the state, and the mechanism the state established to dictate final prices," said Randy Harrison, chief executive officer of Mirant's western U.S. operations. "And if a generation unit in one of our plants was offline during a critical time, it was because it was broken and operating it posed an employee safety threat or an environmental risk. Repairs were made as quickly as humanly possible."

Harrison was responding to allegations by the California Independent System Operator that generators engaged in market manipulation to drive up prices.

"If the ISO believes its numbers show evidence of manipulation by Mirant, then the ISO needs to develop a more accurate understanding of what has happened in the market since May of 2000," Harrison said. "This company has done nothing but stretch its resources to the limit to help a state that has allowed its supply and demand for electricity to get desperately out of balance."
Harrison noted that on-line generation hours at the Mirant power plants are actually 34 percent higher than when Pacific Gas and Electric owned them.

"These allegations mark a turnaround for the California ISO, with the change in tone coming after the ISO became a board of gubernatorial appointees," Harrison said. "Such statements by the California ISO are counterproductive and do nothing to accelerate the development of new power plants, the ultimate solution to this problem."

52.     On April 11, 2001, Mirant issued a press release which stated:

Marce Fuller, president and chief executive officer of Mirant Corporation (NYSE: MIR) today reaffirmed Mirant's first quarter 2001 earnings guidance and announced that the company will take additional provisions in relation to past due amounts from the California Independent System

Operator (CAISO) and the California Power Exchange (PX).

As of March 31, 2001, total amounts owed to Mirant from the CAISO and the PX were $392 million. Cumulative provisions to be taken by Mirant against these amounts will be $295 million. The CAISO and the PX are owed past due payments from California utilities, including Pacific Gas and Electric, which last week filed for bankruptcy protection.

As previously stated in its March 14 news release, Mirant's first quarter 2001 guidance of 46 to 48 cents per share included the assumption that the company would take significant provisions related to the uncertainties in the Western United States energy markets.

"Mirant still expects to meet or exceed its previous guidance for first quarter 2001 and throughout the year," Fuller said. "The provisions to be taken by the company through the first quarter of 2001, combined with the provisions taken last year, reflect our current assessment of the risks associated with the California market situation."

53.     On April 25, 2001, Mirant issued a press release which stated:

Mirant Corp. (NYSE: MIR) today announced record first quarter 2001 earnings from continuing operations of $ 175 million or 51 cents per diluted share, compared with $ 95 million or 27 cents per diluted share in the first quarter of 2000.

Earnings from continuing operations exclude income from SE Finance, a leasing subsidiary transferred to Southern Company on March 5, 2001. The company's reported net income for the first quarter of 2001 is $ 180 million, including the $ 5 million contribution from SE Finance.

"First quarter results reflect a combination of an increasingly successful and sustained North American energy business, continued strong contributions from our international business groups, and extraordinary commodity prices and volatility in both natural gas and power markets," said Marce Fuller, president and chief executive officer of Mirant. "We are pleased with these results, especially given that they reflect no net earnings contribution from

our California assets, because of the significant provisions made by the company, due to the uncertainties in the California market."

Earnings Guidance
Mirant raised its yearly earnings guidance for 2001 to $ 1.90 per share, up from $ 1.55 to $ 1.60 per share. As a result of continued strength in the North American energy market, Mirant expects to grow 20 percent to 25 percent through next year from a $ 1.90 per share. Beyond 2002, Mirant expects that its North American development plan and future acquisitions will allow the company to grow its earnings per share by 20 percent, through 2005.

The Americas
Mirant's Americas group contributed 49 cents per diluted share to earnings in the first quarter of 2001, compared with nearly break-even results in the first quarter of 2000.

The group's overall performance reflects a significant increase in gas marketing volumes across North America. Strong performance from its Northeast power business and its recently acquired mid-Atlantic assets have also positively impacted earnings.

As of March 31, 2001, the total amount owed to Mirant by the California Independent System Operator and the California Power Exchange was $ 392 million. In the first quarter of 2001, Mirant provided for $ 245 million in relation to uncertainties in the California power market. The total amount of provisions made for during 2000 and 2001 in relation to these uncertainties is $ 295 million.

"Mirant remains committed to supplying power and entering into long-term contracts with creditworthy entities in California," Fuller said. "We are dedicated to being an active participant in the search for a long-term solution."

54.    On June 26, 2001, Mirant issued a press release which stated:

Mirant (NYSE: MIR) announced today that it expects to meet its previously

announced earnings guidance for the second quarter 2001, full-year 2001 and its projected growth target for 2002.

"Despite recent rulings by the Federal Energy Regulatory Commission concerning energy price mitigation, we remain on target to meet our previously announced earnings guidance," said Marce Fuller, president and chief executive officer, Mirant. "Our company is founded on a diversified, global portfolio and fundamental business strategies."

55.    On July 31, 2001, Mirant issued a press release which stated:

Mirant (NYSE: MIR) today reported record quarterly earnings for the period ending June 30, 2001.

Earnings from operations totaled $181 million or 52 cents per diluted share compared to $86 million or 25 cents per diluted share for the second quarter, 2000.

. . .

"Our diluted earnings per share from operations grew 108 percent over the second quarter of 2000 largely because of our expertise in integrating generating assets with gas and power marketing in North America," said Marce Fuller, president and chief executive officer, Mirant.

Mirant recently reaffirmed earnings guidance of at least $1.90 per diluted share for 2001. Based on a strong business outlook and a series of new initiatives, the company projects 2002 earnings per diluted share of $2.55 to $2.65 after adding approximately 20 cents per share for new accounting rules pertaining to goodwill and intangibles.

56.    On November 28, 2001, Mirant issued a press release which stated:

Mirant (NYSE: MIR) today said it is confident that the energy marketing sector is mature enough to function without Enron, and that Mirant already has seen new business opportunities develop because of Enron's situation.

Mirant said its current pretax exposure to Enron is approximately $50 million to $60 million, noting that Mirant began limiting its exposure risk early in the Enron crisis.
Mirant believes the openness of its financial dealings and its strategy of integrating assets with an energy marketing operation distinguish it in the marketplace.

57.    On December 14, 2001, Mirant issued a press release which stated:

Mirant (NYSE: MIR) today announced that it expects to end this year with over $1 billion of available cash and credit lines. The company currently has approximately $1.5 billion in available cash and credit lines.

Mirant's projected liquidity position assumes that the company will close on its announced acquisition of Eco Electrica from Enron and Edison Mission Energy before the end of the year, and that it will use approximately $600 million to complete the transaction. The closing date for the transaction has not been set due to uncertainty surrounding Enron's current bankruptcy situation.

"As we have stated repeatedly, we manage our business with the financial flexibility to operate under a variety of capital market conditions," said Ray Hill, chief financial officer, Mirant. "Our commitment to credit quality remains a cornerstone of Mirant's business."

In light of recent investor concerns over credit ratings issues, the company reiterated that it has no ratings related accelerations in its current corporate facilities. The company is currently rated Baa2 by Moody's, BBB- by Standard & Poor's, and BBB by Fitch, Inc.

The company believes it is solidly positioned within its ratings categories but acknowledges the evolving nature of ratings criteria in light of recent developments in the sector. Mirant reiterates its commitment to maintain its investment grade credit ratings.

"Mirant's outstanding performance in 2001 demonstrates that we are the premier integrated energy company in the sector," said Hill. "Our ability to

integrate assets with marketing and risk management expertise enables us to capitalize on rapidly changing market conditions and we look to 2002 with confidence."

58.    The statements set forth in ¶¶ 48-57 were materially misleading and inaccurate when issued because defendants failed to disclose to Plan participants that Mirant had engaged in extensive illegal conduct that was designed to and did manipulate the California energy market, inflate energy trading revenues, and generate illegal profits for Mirant.  In breach of their fiduciary duties, defendants led Plan participants to believe that Mirant's financial performance was based on legitimate operations, when in fact a material portion of Mirant's revenues and net income was the result of illegal market and earnings manipulations which, when revealed, would have a devastating effect on Mirant and its stock price.

59.    Beginning in mid-December 2001, Mirant's stock price began a 10-month collapse from approximately $30 per share to less than $2 per share as Mirant's illegal market manipulation was exposed.

60.    On March 11, 2002, California Attorney General Bill Lockyer ("Lockyer") filed a complaint in the Superior Court of San Francisco County against Mirant and others alleging that Mirant illegally manipulated energy prices in California during 2000 and 2001 (the "March 11 Complaint").  In the March 11 Complaint, Lockyer sought approximately $112 million in compensatory damages

24

and $55 million in penalties. Lockyer alleged that Mirant:

> [c]onspired to engage in and engaged in a scheme to violate the rules of the [California Independent System Operator ("ISO")] market and tortuously convert property to which the ISO has an exclusive property right, all to the detriment of the reliability of the California electricity market and California's residents and ratepayers. In particular, [Mirant and the other defendants] have repeatedly sold electricity generating capacity to the ISO for use as a reserve and in the event of a state of emergency, and subsequently and unlawfully sold the same capacity into the lucrative "spot" market for wholesale power. As a result, [Mirant and the other defendants] have unlawfully collected millions of dollars.

61.     On or about March 20, 2002, Lockyer filed a complaint with the Federal Energy Regulatory Commission ("FERC") against Mirant and others alleging that Mirant unlawfully sold energy in California in 2000 and 2001 by, *inter alia*, failing to provide FERC and the public an adequate opportunity to determine whether the rates charged were just and reasonable and charging rates that were unjust and unreasonable. In the "March 20 Complaint," Lockyer sought a refund of up to $2.8 billion.

62.     On or about April 9, 2002, Lockyer filed another complaint in the Superior Court of San Francisco County against Mirant and others alleging that in 2000 and 2001 Mirant engaged in price gouging and "unjust, unreasonable, and illegal overcharges" in the California energy market by, *inter alia*, failing to file

rates with required regulatory authorities and illegally acquiring power generation facilities in California (the "April 9 Complaint"). In the April 9 Complaint, Lockyer sought compensatory and punitive damages in excess of $1 billion.

63.    On or about April 15, 2002, Lockyer filed a complaint in the United States District Court for the Northern District of California against Mirant and others alleging that Mirant violated federal antitrust laws by "seizing illegal control of electricity supplies" in California and illegally exercising market power to driving up electricity costs in 2000 and 2001 (the "April 15 Complaint"). In the April 15 Complaint, Lockyer sought compensatory and punitive damages and an order requiring Mirant to divest its California power generation facilities.

64.    On or about May 7, 2002, FERC ordered Mirant and others to provide detailed information concerning their energy trading activities in California in 2000 and 2001 and to admit or deny whether they engaged in certain illegal trading practices conducted by Enron Corporation and others.

65.    On May 24, 2002, *The Atlanta Journal and Constitution* reported:

Mirant Corp. has acknowledged engaging in one of the controversial energy trading practices used by Enron Corp. during California's electricity crisis, but Mirant insisted it complied with federal and state rules.

The company also said it didn't think it had engaged in a second such practice but couldn't say for sure.

In a sworn filing with federal regulators, the Atlanta-based energy supplier denied engaging in eight of the 10 trading practices that came to light this month in three internal Enron documents that have focused new attention on alleged price manipulation in California's unregulated electricity market.

The December 2000 memos described 10 specific tactics --- described with such code names as "Fat Boy" and "Get Shorty" --- that Enron traders apparently used to limit supplies and drive up prices with phantom electricity demand during California's electricity crisis. A suggestion in the Enron memos that other energy companies may have used similar tactics to inflate prices prompted the Federal Energy Regulatory Commission to order 150 companies, including Mirant, to submit sworn statements this week admitting or denying they employed the same practices.

Mirant acknowledged engaging in one of the practices --- producing electricity at a level higher than forecasted demand --- but said it did so with the approval of California energy officials.

Mirant said it lacked sufficient information to say whether it had engaged in a second practice under investigation --- selling electricity outside California to evade price caps.

The company also said it engaged in a "possible variation" of a third practice, known as "megawatt laundering."

66.    On June 10, 2002, the *Wall Street Journal* reported:

Traders at Xcel Energy Inc. and Mirant Corp. discussed "games" to profit from California's chaotic electricity market in 2000 as they negotiated energy transactions, according to transcripts Xcel has given to federal regulators.

The transcripts, made available by the Federal Energy Regulatory

Commission on its Web site (www.ferc.fed.us), provide evidence that companies other than Enron Corp. considered some of the same strategies outlined by Enron's lawyers in recently released memos. The Xcel and Mirant traders discuss schemes to schedule nonexistent power use and to take advantage of "congestion" payments on California's overburdened electric grid.

. . .

In a May 22 filing with FERC, Xcel, Minneapolis, described how its Public Service Co. of Colorado unit traded energy with Southern Co. Energy Marketing, now Mirant, in a way that enabled it to profit from California's energy market in 2000 and 2001.

The filing has been available on Xcel's Web site since May 22, but didn't attract attention until FERC posted responses to its queries about "Enron-style" trading tactics from more than 100 energy generators and marketers on its Web site late last week. By attaching joke- and obscenity-laced transcripts of its traders' phone conversations, Xcel offered a window into the way energy companies took advantage of California's electricity woes.

On July 18, 2000, for example, Xcel said it sold 300 megawatt-hours of electricity to Mirant for $277 a megawatt-hour. In a conversation recorded that day, a Mirant trader asks an Xcel trader if he wants "to do an ex-post type of game or you want to do a congestion type of game plus ex-post." The Mirant trader suggests limiting the deal to 50 megawatts an hour because "I don't want to crush the market too bad," and suggests the companies "try to benefit from trying to relieving (sic) some of that Path 26 congestion."

An "ex-post" strategy involved making power available to California's grid operator at the last minute to meet shortages, bypassing the bidding processes designed to set fair prices. Congestion strategies involved payments for promising to generate more electricity in some areas and cut use in others to ease grid bottlenecks, although no power actually moved in many cases.

On July 19, when the electricity would have been delivered, California's grid operator paid as much as $500 a megawatt-hour for power, the highest price then allowed, and declared a Stage 2 emergency, forcing power

distribution to be cut to some businesses.

In another conversation, on June 20, a Mirant trader outlines a plan to tell grid operators it would move electricity from Southern California to Northern California, when in fact, the energy was flowing the other way. "It's kind of loop-t-looping (sic), but it's making money," the trader said, according to the transcript. Xcel said it sold 450 megawatt-hours to Mirant that day for $60 a megawatt-hour.

67.    On August 5, 2002, Mirant announced that the Securities and

Exchange Commission had launched an inquiry into the Company and "requested

additional information about Mirant's recently disclosed shareholder litigation, any

round-trip trades entered into by or on behalf of the company, and the Federal

Energy and Regulatory Commission's investigation into energy-trading practices

in the western United States."

68.    On August 15, 2002, *The New York Times* reported:

Mirant, the biggest North American natural gas trader, said today that an accounting review had turned up mistakes that may have inflated figures on its balance sheet as much as $1.1 billion.

Straightening out the errors may reduce Mirant's $22.8 billion in assets and liabilities as of the end of 2001 by less than 5 percent, the company said in a statement. Mirant said it did not expect the mistakes to change operating results, revenue, expenses, net income, liquidity or cash flow.

Mirant has reconciled $168 million of $253 million in misstatements it disclosed two weeks ago, a spokesman, James Peters, said.

Marce Fuller, the chief executive, certified the accuracy of Mirant's 2001 filings and its 2002 first-quarter report to the S.E.C. Mirant cannot complete

and certify its second-quarter results until KPMG International, which
became its auditor in May, completes a review in 30 to 60 days.

69.    On November 7, 2002, Mirant issued a press release which stated:

Mirant (NYSE: MIR) today announced that it has certified and filed its
second quarter 2002 Form 10-Q, and an amended first quarter 2002 Form 10-
Q, with the Securities and Exchange Commission (SEC). The filings are in
full compliance with government certification requirements and were
completed following Mirant's extensive internal reviews, and the review of
its independent auditors.

The reviews found that, due to accounting errors, the company's net income
from January 1, 1999 through June 30, 2002 was overstated by $41 million.
By comparison, Mirant's cumulative net income for this period was
approximately $1 billion. The net $41 million overstatement is the result of
net income being understated by $10 million in the first six months of 2002
and overstated by $51 million from 1999 through 2001.

Mirant has requested its independent auditors to reaudit the company's 2000
and 2001 financial statements. The company cites two factors for the reaudit:

* To address accounting errors identified during the review.
* To enable its independent auditors to provide an opinion on Mirant's
2000 and 2001 financial statements, which will be revised to comply
with the new accounting standards of the Financial Accounting Standards
Board's (FASB) Emerging Issues Task Force (EITF) Issue 02-03, and
FASB's SFAS No. 144. (Mirant's former independent auditors, Arthur
Andersen, are no longer available to provide an opinion on these
statements)

Revisions to previously reported net income from the first and second
quarter are reflected in today's Form 10-Q filings. The revisions incorporate
the $10 million net understatement of net income in the first six months of
2002. In addition, the filings include a further write down of $42 million in

30

Mirant's investment in WPD, which was disclosed at the time it was sold in the third quarter. Mirant's first quarter loss was revised to $6 million versus the $42 million loss initially reported. The company's second quarter loss was revised to $220 million (which includes the $42 million write down of WPD), versus the $152 million loss reported.

Mirant reports that these corrections address its previously disclosed accounting issues. The company will work with its independent auditors during the course of the reaudit process to determine the specific interim financial reporting periods to which the identified corrections relate and any other corrections determined to be necessary by the reaudit. The company expects that it will restate its financials for either or both 2000 and 2001, and possibly interim periods, following the reaudit. The company does not believe that the reaudit can be completed until it files its 2002 Form 10-K.

Mirant also moved to strengthen its internal accounting controls and procedures in response to recent recommendations that address a material control weakness identified by its independent auditors.

70.    On December 4, 2002, the *Fulton County Daily Report* reported:

A former Mirant Corp. employee has claimed that the Atlanta-based energy marketer's legal department issued orders to erase computer data after the company became the target of an investigation by California.

"They [Mirant executives and attorneys] had us deleting files in order to cover up information, to get rid of information that would have been damaging to them in court," that employee told the Daily Report Tuesday on the condition that he not be named. "They knew it and we knew it."

Mirant CEO S. Marce Fuller was among 40 to 50 senior executives and traders whose computers were cleansed of certain e-mail and files, according to the former employee whose allegations have surfaced in a federal suit.

71.    On March 27, 2003, *The Atlanta Journal-Constitution* reported:

After a 13-month investigation, federal regulators have concluded that 37 energy companies, including Atlanta-based Mirant Corp., manipulated prices during the California energy crisis three years ago.

The companies could face sanctions and be required to give back profits as a result, the Federal Energy Regulatory Commission said.

FERC ordered three companies --- Houston-based Reliant Resources Inc. and Enron Corp., and BP PLC --- to show why their electricity-trading privileges and profits shouldn't be stripped.

It also signaled that it plans to require the other companies in coming weeks to provide evidence that they didn't violate power-trading regulations during the crisis, which spawned rolling blackouts and sent utility bills skyrocketing in late 2000 and early 2001.

FERC also said it expects the amount of refunds due California energy customers overcharged by the companies will exceed the $1.8 billion that an administrative judge recommended last December.

The final amount of refunds won't be determined for several weeks. It will likely be less than the nearly $9 billion Gov. Gray Davis has said California's ratepayers are due and probably closer to $3 billion, according to FERC investigators.

Doug Miller, Mirant senior vice president and general counsel, said, "We welcome this opportunity to speak directly to FERC about the extensive, Mirant-specific information we provided to the commission. ... We're confident in our ability to demonstrate that we operated with integrity."

FERC's findings confirm that --- as California officials contended all along --- power companies illegally bid up prices, manipulated supplies and gave false trading information to increase their profits at consumers' expense.

"It took two years for FERC to confirm what we knew all along: There was widespread market manipulation and a massive rip-off of California ratepayers," Davis said in a statement Wednesday. "Now the question is whether the FERC commissioners will have the grit to order the remedies

that are necessary."

## CLAIMS FOR RELIEF

72.     At all relevant times, defendants were and acted as fiduciaries

within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  ERISA

imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. §

1104(a), states, in relevant part, that:

(1) [A] fiduciary shall discharge his duties with respect to a plan solely in the
interest of the participants and beneficiaries and –

     (A)    for the exclusive purpose of

          (I)    providing benefits to participants and their beneficiaries;
               and

          (ii)   defraying reasonable expenses of administering the plan;

     (B)    with the care, skill, prudence, and diligence under the
             circumstances then prevailing that a prudent man acting in a like
             capacity and familiar with such matters would use in the
             conduct of an enterprise of like character and with like aims;

     (C)    by diversifying the investments of the plan so as to minimize the
             risk of large losses, unless under the circumstances it is clearly
             prudent not to do so; and

     (D)    in accordance with the documents and instruments governing
             the plan insofar as such documents and instruments are
             consistent with the provisions of this title and Title IV.

73.     ERISA also imposes strict co-fiduciary duties on plan fiduciaries.

33

ERISA § 405; 29 U.S.C. § 1105, states, in relevant part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(a)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(b)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(c)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## COUNT I

### (Breach of Duties of Prudence and Loyalty and
### Failure to Disseminate Necessary Information)

74.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

75.    ERISA fiduciaries have a duty to speak truthfully, to not mislead participants, and to disclose truthful information on their own initiative when participants need such information to exercise their rights under the plan. In a plan with various funds available for investment, this duty to inform and disclose includes: (1) the duty to provide to plan participants material information of which

34

the fiduciary has or should have knowledge that is sufficient to advise the average

plan participant of the risks associated with investing in any particular fund; and

(2) the duty to refrain from making material misrepresentations.

76.    A fiduciary must not only disclose complete and correct material

information, but must provide information (even where not requested) if failing to

convey the information would be harmful to participants. In essence, a fiduciary

must act to protect participants from losses when he knows or should know of facts

that cast doubt on the soundness of certain plan investment alternatives.

77.    Defendants breached their fiduciary duties by failing to provide Plan

participants and beneficiaries with complete and accurate information regarding

investment in Mirant stock, including, but not limited to, failing to disclose that

Mirant had engaged in illegal manipulation of the California energy market, which

when disclosed had a devastating effect on the Company and on Mirant's stock

price. Defendants misled participants and beneficiaries regarding the soundness

and prudence of investing their retirement benefits in Mirant stock. This

information was especially critical because investment in Mirant stock is, by

definition, an undiversified investment in a single company's common stock and,

as such, carries with it an inherently high degree of risk.

35

78.     Under ERISA, fiduciaries are responsible for the prudence of plan investments unless plan participants and beneficiaries themselves exercised effective and informed control over their individual accounts.  ERISA § 404(c), 29 U.S.C. § 1104(c).

79.     Plan participants and beneficiaries did not exercise such control in this case as defendants failed to provide them with complete and accurate information regarding Mirant's true business health and forward-looking profitability, and misled them regarding the appropriateness of Mirant stock as a Plan investment. Therefore, defendants remained responsible for ensuring that Plan assets were invested prudently, and are liable for losses to the Plan that were incurred as a result of imprudent investments.

## COUNT II

### (Failure to Diversify Plan Assets and Engaging in Prohibited Transactions)

80.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

81.     Defendants breached their fiduciary duty to diversify Plan assets in order to prudently reduce the risk of large losses inherent in placing a large percentage of the Plan's investment portfolio, or allowing such a percentage to

36

accumulate over time, in the shares of stock of any one publicly traded corporation. Moreover, defendants not only failed to properly diversify Plan assets, but permitted the Plan to acquire shares of Mirant stock at artificially inflated prices, in further violation of ERISA, § 406 (prohibits direct or indirect acquisition of qualified employer security for more than "adequate consideration").

82.     As a result of defendants allowing an imprudently high percentage of the Plan's assets to be held in the form of Mirant common stock, plaintiff and members of the Class, as well as the Plans as a whole, suffered losses, the amount of which will be determined at trial.

## COUNT III

### (Failure to Monitor Investment Alternatives)

83.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

84.     A fiduciary's duties of loyalty and prudence also entail a duty to continually monitor and, if necessary and prudent, conduct independent investigations into the relative merits of all the investment alternatives available in a plan, including employer securities, to ensure that each investment is a suitable and prudent option for the plan.

85.    Defendants breached this duty of monitoring and investigation with respect to the Company stock investment alternative. By no later than the beginning of the Class Period, defendants could and should have made a determination that Mirant stock was not a suitable and prudent investment alternative for the Plan, either for a participant's discretionary account or for the Company's matching investments.  By the beginning of the Class Period, if not before, Mirant stock was plainly an unsuitable and imprudent investment option for the Plan and its participants and beneficiaries.

86.    Defendants and the other as yet unnamed individual defendants further breached their fiduciary duties by not monitoring or putting in place procedures to monitor the actions of the Plan Administrator and other Plan fiduciaries.


## COUNT IV

### (Failure to Avoid Conflicts of Interest)

87.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

88.    The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always

38

administer a plan with an unwavering "eye-single" toward the interests of the plan's participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

89.     Defendants breached their fiduciary duty to avoid conflicts of interest (and to promptly resolve them) by: continuing to allow investment in Mirant stock as an investment alternative within the Plans during the Class Period; failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investments in Company stock and the quality and quantity of the information provided to Plan participants and beneficiaries concerning such investments; and, generally, by failing to take the necessary steps to ensure that the Plans' fiduciaries did not suffer from conflicts of interest.

## COUNT V

### (Breaches of Co-Fiduciary Duties)

90.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

91.     Each defendant, in addition to his or her individual breaches of fiduciary duty, knowingly participated in the above-described fiduciary breaches of their co-fiduciaries, enabled their co-fiduciaries to commit such fiduciary breaches

by their own failure to comply with the provisions of ERISA § 404(a), 29 U.S.C. §

1104(a), and had knowledge of the breaches of their co-fiduciaries and failed to

make reasonable efforts to remedy such breaches.

## CAUSATION

92.    The Plans suffered tens and possibly hundreds of millions of dollars

in losses because substantial assets of the Plans were imprudently invested, or

allowed to be invested by defendants, in Mirant stock during the Class Period, in

breach of defendants' fiduciary duties.  This loss was reflected in the diminished

account balances of the Plans' participants.

93.    Defendants are responsible for losses caused by participant direction

of investment in Mirant stock because defendants failed to take the necessary and

required steps to ensure effective and informed independent participant control

over the investment decision-making process, as required by ERISA § 404(c), 29

U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants

concealed material, non-public facts from participants, and provided misleading,

inaccurate, and incomplete information to them regarding the true health and

ongoing profitability of the Company, and therefore its soundness as an investment

vehicle.  As a consequence, participants did not exercise independent control over

their investments in Company stock, and defendants remain liable under ERISA for losses caused by such investment.

94.    Defendants are also responsible for all losses caused by the investment of the Plans' Company matching contributions in Mirant stock during the Class Period, as defendants controlled the investment, and the investment was imprudent.

95.    Had the defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Company stock, eliminating Company stock as an investment alternative when it became imprudent, and divesting the Plans from Company stock when maintaining such an investment became imprudent, the Plans would have avoided a substantial portion of the losses that they suffered through their continued investment in Company stock.

**REMEDY FOR BREACHES OF FIDUCIARY DUTY**

96.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such

41

plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable
or remedial relief as the court may deem appropriate . . . ."

97.    With respect to calculation of the losses to a plan, breaches of
fiduciary duty result in a presumption that, but for the breaches of fiduciary duty,
the participants and beneficiaries in the plan would not have made or maintained its
investments in the challenged investment and, where alternative investments were
available, that the investments made or maintained in the challenged investment
would have instead been made in the most profitable alternative investment
available. In this way, the remedy restores the values of the plan's assets to what
they would have been if the plan had been properly administered.

98.    Plaintiff and the Class are therefore entitled to relief from the
defendants in the form of: (1) a monetary payment to the Plans to make good to the
Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged
above in an amount to be proven at trial based on the principles described above, as
provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other
appropriate equitable relief to remedy the breaches alleged above, as provided by
ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3)
reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C.
§ 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs

42

and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.    That the Court certify this action as a class action under Rule 23(b)(1), 23(b)(2) and 23(b)(3) with respect to the Class to the extent necessary to effect the purposes of this suit;

B.    That the Court enter Judgment providing the following relief to Plaintiff, and the Class:

(i)    Joint and several liability against defendants, requiring them to make the Plans whole for the losses incurred as a result of their violations of ERISA, pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1109(a);

(ii)    Injunctive relief enjoining defendants from continuing to violate their fiduciary duties under ERISA and the Plan documents, pursuant to ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3);

(iii)    Other injunctive and equitable relief as appropriate to remedy the breaches alleged above, pursuant to ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3);

(iv)    Reasonable attorneys' fees and costs incurred by Plaintiff and the Class, pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g);

(v)     Interest on all Judgment amounts as provided by law; and

(vi)    Such other legal or equitable relief as may be just and proper.

Dated: April 17, 2003

_Joshua A. Millican_
_____

**LAW OFFICE OF JOSHUA A. MILLICAN**
Joshua A. Millican
Georgia Bar No. 508998
The Grant Building, Suite 400
44 Broad Street N.W.
Atlanta, Georgia 30303
Ph (404) 221-1555
Fax (404) 221-0914


**SCHIFFRIN & BARROWAY, LLP**
Richard S. Schiffrin
Joseph H. Meltzer
Edward W. Ciolko
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania  19004
Ph (610) 667-7706
Fax (610) 667-7056

**Attorneys for Plaintiff**

AO 440 (Rev. 10/93) Summons in a Civil Action

# ORIGINAL United States District Court

_Northern_ **DISTRICT OF** _Georgia_

James Brown, on behalf of himself and all
others similarly situated.

**SUMMONS IN A CIVIL CASE**

v.

Mirant Corporation, The Southern Company, Vance Booker,
S. Maree Fuller, Raymond D. Hill, James A. Ward, A.W. Dahlberg,
A.D. Correll, Elmer B. Harris, William J. Hierpe,
David J. Lesar, W.L. Westbrook, and Unknown
Fiduciary Defendants 1-100

**CASE NUMBER: 1:03-CV-1027**

TO: (Name and address of defendant)
W.L. Westbrook
c/o Mirant Corporation
1155 Perimeter Center West, Suite 100
Atlanta, GA 30338

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Law Office of Joshua A. Millican
Joshua A. Millican
The Grant Building, Suite 400
44 Broad Street NW
Atlanta, GA 30303

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

BY) DEPUTY CLERK

DATE

Apr. 17, 2003 12:15PM    WABCO HR    No.2303    P. 2

AO 440 (Rev. 10/93) Summons In a Civil Action

# ORIGINAL United States District Court

NORTHERN _____ **DISTRICT OF** _____ Georgia

James Brown, on behalf of himself and all others similarly situated.

### SUMMONS IN A CIVIL CASE

**v.**

Mirant Corporation, The Southern Company, Vance Booker, S. Marce Fuller, Raymond D. Hill, James A. Ward, A.W. Dahlberg, A.D. Correll, Elmer B. Harris, William J. Hierpe, David J. Lesar, W.L. Westbrook, and Unknown Fiduciary Defendants 1~100

CASE NUMBER: **1 : 0 3 - C V - 1 0 2 7**

TO: (Name and address of defendant)
David J. Lesar
c/o Mirant Corporation
1155 Perimeter Center West, Suite 100
Atlanta, GA 30338

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Law Office of Joshua A. Millican
Joshua A. Millican
The Grant Building, Suite 400
44 Broad Street NW
Atlanta, GA 30303

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

BY) DEPUTY CLERK

DATE

AO 440 (Rev. 10/93) Summons in a Civil Action

# United States District Court

ORIGINAL _Northern_ _____  DISTRICT OF ___Georgia___

James Brown, on behalf of himself and all others similarly situated.

**SUMMONS IN A CIVIL CASE**

V.

Mirant Corporation, The Southern Company, Vance Booker, S. Marce Fuller, Raymond D. Hill, James A. Ward, A.W. Dahlberg, A.D. Correll, Elmer B. Harris, William J. Hierpe, David J. Lesar, W.L. Westbrook, and Unknown Fiduciary Defendants 1-100

CASE NUMBER: **1:03-CV-1027**

TO: (Name and address of defendant)

William J. Hierpe
c/o Mirant Corporation
1155 Perimeter Center West, Suite 100
Atlanta, GA 30338

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Law Office of Joshua A. Millican
Joshua A. Millican
The Grant Building, Suite 400
44 Broad Street NW
Atlanta, GA 30303

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

APR 1 7 2003

DATE

(BY) DEPUTY CLERK

AO 440 (Rev. 10/93) Summons in a Civil Action

# ORIGINAL United States District Court

Northern _____ DISTRICT OF _____ Georgia

James Brown, on behalf of himself and all
others similarly situated.

## SUMMONS IN A CIVIL CASE

v.

Mirant Corporation, The Southern Company, Vance Booker,
S. Marce Fuller, Raymond D. Hill, James A. Ward, A.W. Dahlberg,
A.D. Correll, Elmer B. Harris, William J. Hierpe,
David J. Lesar, W.L. Westbrook, and Unknown
Fiduciary Defendants 1-100

CASE NUMBER:  **1:03-CV-1027**

TO: (Name and address of defendant)

Elmer B. Harris
c/o Mirant Corporation
1155 Perimeter Center West, Suite 100
Atlanta, GA 30338

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Law Office of Joshua A. Millican
Joshua A. Millican
The Grant Building, Suite 400
44 Broad Street NW
Atlanta, GA 30303

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

APR 17 2003

DATE

BY) DEPUTY CLERK

AO 440 (Rev. 10/93) Summons in a Civil Action

# ORIGINAL United States District Court

NORTHERN _____ DISTRICT OF _____ Georgia

James Brown, on behalf of himself and all
others similarly situated.

**SUMMONS IN A CIVIL CASE**

v.

Mirant Corporation, The Southern Company, Vance Booker,
S. Marce Fuller, Raymond D. Hill, James A. Ward, A.W. Dahlberg,
A.D. Correll, Elmer B. Harris, William J. Hierpe,
David J. Lesar, W.L. Westbrook, and Unknown
Fiduciary Defendants 1-100

CASE NUMBER:  **1:03-CV-1027**

TO: (Name and address of defendant)

A.D. Correll
c/o Mirant Corporation
1155 Perimeter Center West, Suite 100
Atlanta, GA 30338

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Law Office of Joshua A. Millican
Joshua A. Millican
The Grant Building, Suite 400
44 Broad Street NW
Atlanta, GA 30303

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

APR 17 2003

BY) DEPUTY CLERK

DATE

AO 440 (Rev. 10/93) Summons in a Civil Action

# ORIGINAL United States District Court

NORTHERN _____ DISTRICT OF _____ Georgia _____

James Brown, on behalf of himself and all
others similarly situated.

## SUMMONS IN A CIVIL CASE

V.

Mirant Corporation, The Southern Company, Vance Booker,
S. Marce Fuller, Raymond D. Hill, James A. Ward, A.W. Dahlberg
A.D. Correll, Elmer B. Harris, William J. Hierpe,
David J. Lesar, W.L. Westbrook, and Unknown
Fiduciary Defendants 1-100

CASE NUMBER: **1:03-CV-1027**

TO: (Name and address of defendant)

A.W. Dahlberg
c/o Mirant Corporation
1155 Perimeter Center West, Suite 100
Atlanta, GA 30338

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Law Office of Joshua A. Millican
Joshua A. Millican
The Grant Building, Suite 400
44 Broad Street NW
Atlanta, GA 30303

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

_W. Rose_

BY) DEPUTY CLERK

APR 17 2003

DATE

AO 440 (Rev. 10/93) Summons in a Civil Action

# ORIGINAL United States District Court

Northern _____ **DISTRICT OF** _Georgia_

James Brown, on behalf of himself and all
others similarly situated.

### SUMMONS IN A CIVIL CASE

**V.**

Mirant Corporation, The Southern Company, Vance Booker,
S. Marce Fuller, Raymond D. Hill, James A. Ward, A.W. Dahlberg,
A.D. Correll, Elmer B. Harris, William J. Hienpe,
David J. Lesar, W.L. Westbrook, and Unknown
Fiduciary Defendants 1-100

**CASE NUMBER:** **1 : 0 3 - C V - 1 0 2 7**

**TO:** (Name and address of defendant)

James A. Ward
c/o Mirant Corporation
1155 Perimeter Center West, Suite 100
Atlanta, GA 30338

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Law Office of Joshua A. Millican
Joshua A. Millican
The Grant Building, Suite 400
44 Broad Street NW
Atlanta, GA 30303

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

_(signature)_

BY) DEPUTY CLERK

APR 17 2003

DATE

AO 440 (Rev. 10/93) Summons in a Civil Action

# ORIGINAL United States District Court

Northern _____ **DISTRICT OF** _Georgia_

James Brown, on behalf of himself and all
others similarly situated.

**SUMMONS IN A CIVIL CASE**

**V.**

Mirant Corporation, The Southern Company, Vance Booker,
S. Marce Fuller, Raymond D. Hill, James A. Ward, A.W. Dahlberg
A.D. Correll, Elmer B. Harris, William J. Hierpe,
David J. Lesar, W.L. Westbrook, and Unknown
Fiduciary Defendants 1-100

**CASE NUMBER:** **1 : 0 3 - C V - 1 0 2 7**

TO: (Name and address of defendant)

Raymond D. Hill
c/o Mirant Corporation
1155 Perimeter Center West, Suite 100
Atlanta, GA 30338

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Law Office of Joshua A. Millican
  Joshua A. Millican
The Grant Building, Suite 400
44 Broad Street NW
Atlanta, GA   30303

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

_W. Ross_

BY) DEPUTY CLERK

APR 1 7 2003

DATE

AO 440 (Rev. 10/93) Summons in a Civil Action

# ORIGINAL United States District Court

Northern _____ DISTRICT OF _____ Georgia

James Brown, on behalf of himself and all others similarly situated.

**SUMMONS IN A CIVIL CASE**

V.

Mirant Corporation, The Southern Company, Vance Booker, S. Marce Fuller, Raymond D. Hill, James A. Ward, A.W. Dahlberg, A.D. Correll, Elmer B. Harris, William J. Hierpe, David J. Lesar, W.L. Westbrook, and Unknown Fiduciary Defendants 1-100

CASE NUMBER: **1:03-CV-1027**

TO: (Name and address of defendant)

S. Marce Fullen
c/o Mirant Corporation
1155 Perimeter Center West, Suite 100
Atlanta, GA 30338

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Law Office of Joshua A. Millican
Joshua A. Millican
The Grant Building, Suite 400
44 Broad Street NW
Atlanta, GA 30303

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

APR 17 2003

DATE

BY DEPUTY CLERK

AO 440 (Rev. 10/93) Summons in a Civil Action

# ORIGINAL United States District Court

NORTHERN _____ DISTRICT OF _____ Georgia

James Brown, on behalf of himself and all
others similarly situated.

**SUMMONS IN A CIVIL CASE**

v.

Mirant Corporation, The Southern Company, Vance Booker,
S. Marce Fuller, Raymond D. Hill, James A. Ward, A.W. Dahlberg,
A.D. Correll, Elmer B. Harris, William J. Hienpe,
David J. Lesar, W.L. Westbrook, and Unknown
Fiduciary Defendants 1-100

CASE NUMBER 1 : 03 - C v - 1027

TO: (Name and address of defendant)

Vance Booker
c/o Mirant Corporation
1155 Perimeter Center West, Suite 100
Atlanta, GA 30338

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Law Office of Joshua A. Millican
Joshua A. Millican
The Grant Building, Suite 400
44 Broad Street NW
Atlanta, GA 30303

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

APR 17 2003

DATE

BY) DEPUTY CLERK

APR. 17. 2003 12:15PM  WAECO HR

AO 440 (Rev. 10/93) Summons in a Civil Action

# ORIGINAL United States District Court

NORTHERN _____ DISTRICT OF _Georgia_

James Brown, on behalf of himself and all
others similarly situated

## SUMMONS IN A CIVIL CASE

V.

Mirant Corporation, The Southern Company, Vance Booker,
S. Marce Fuller, Raymond D. Hill, James A. Ward, A.W. Dahlberg,
A.D. Correll, Elmer B. Harris, William J. Hierpe,
David J. Lesar, W.L. Westbrook, and Unknown
Fiduciary Defendants 1-100

CASE NUMBER: 1:03-CV-1027

TO: (Name and address of defendant)

c/o Mirant Corporation
1155 Perimeter Center West, Suite 100
Atlanta, GA 30338

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Law Office of Joshua A. Millican
  Joshua A. Millican
The Grant Building, Suite 400
44 Broad Street NW
Atlanta, GA  30303

an answer to the complaint which is herewith served upon you, within ____20____ days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief
demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after
service.

LUTHER D. THOMAS

APR 17 2003

CLERK                                                   DATE

_Wanda Lee_

(BY) DEPUTY CLERK

No.2805   P. 2

WABCO HR    Apr.17. 2003 12:15PM

AO 440 (Rev. 10/93) Summons in a Civil Action

# ORIGINAL United States District Court

_Northern_ _____ **DISTRICT OF** _Georgia_

_James Brown, on behalf of himself and all others similarly situated_

**v.**

_Mirant Corporation, The Southern Company, Vance Booten, S. Marce Fuller, Raymond D. Hill, James A. Ward, A.W. Dahlberg, A.D. Correll, Elmer B. Harris, William J. Hienpe, David J. Lesar, W.L. Westbrook, and Unknown Fiduciary Defendants 1-100_

## SUMMONS IN A CIVIL CASE

**CASE NUMBER:** 1:03-CV-1027

TO: (Name and address of defendant)

_The Southern Company_
_Attn: Tommy Chisholm_
_270 Peachtree Street_
_Atlanta GA 30303_

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

_Law Office of Joshua A. Millican_
_Joshua A. Millican_
_The Grant Building, Suite 400_
_44 Broad Street NW_
_Atlanta, GA 30303_

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS
CLERK

W D Ross
BY) DEPUTY CLERK

APR 17 2003
DATE